(Slip Opinion)     OCTOBER TERM, 2011     1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## TANIGUCHI *v.* KAN PACIFIC SAIPAN, LTD., DBA MARIANAS RESORT AND SPA

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 10–1472.   Argued February 21, 2012—Decided May 21, 2012

Title 28 U. S. C. §1920, as amended by the Court Interpreters Act, in-
cludes "compensation of interpreters" among the costs that may be
awarded to prevailing parties in federal-court lawsuits. §1920(6).  In
this case, the District Court awarded costs to respondent as the pre-
vailing party in a civil action instituted by petitioner.  The award in-
cluded the cost of translating from Japanese to English certain doc-
uments that respondent used in preparing its defense.  The Ninth
Circuit affirmed, concluding that §1920(6) covers the cost of translat-
ing documents as well as the cost of translating live speech.

*Held:* Because the ordinary meaning of "interpreter" is someone who
translates orally from one language to another, the category "com-
pensation of interpreters" in §1920(6) does not include the cost of
document translation.  Pp. 3–15.

   (a) Section 1920 reflects the substance of an 1853 Act that specified
for the first time what costs are allowable in federal court.  That pro-
vision defines the term "costs" as used in Federal Rule of Civil Proce-
dure 54(d), which gives courts the discretion to award costs to pre-
vailing parties.  *Crawford Fitting Co.* v. *J. T. Gibbons, Inc.*, 482 U. S.
437, 441.  As originally configured, §1920 contained five categories of
taxable costs, but in 1978, Congress enacted the Court Interpreters
Act, which added a sixth category that includes "compensation of in-
terpreters." §1920(6).  Pp. 3–5.

   (b) Because the term "interpreter" is not defined in the Court In-
terpreters Act or in any other relevant statutory provision, it must be
given its ordinary meaning.  *Asgrow Seed Co.* v. *Winterboer*, 513 U. S.
179, 187.  When Congress passed that Act in 1978, many dictionaries
defined "interpreter" as one who translates spoken, as opposed to

written, language. Pre-1978 legal dictionaries also generally defined "interpreter" and "interpret" in terms of oral translation. Respondent relies almost exclusively on a version of Webster's Third New International Dictionary that defined "interpreter" as "one that translates; *esp*: a person who translates orally for parties conversing in different tongues." Although the sense divider *esp* (for especially) indicates that the most common meaning of the term is one "who translates orally," that meaning is subsumed within the more general definition "one that translates." That a definition is broad enough to encompass one sense of a word does not establish, however, that the word is ordinarily understood in that sense. See *Mallard* v. *United States Dist. Court for Southern Dist. of Iowa*, 490 U. S. 296, 301. Although all relevant dictionaries defined "interpreter" at the time of the statute's enactment as including persons who translate orally, only a handful defined the word broadly enough to encompass translators of written materials. Notably, the Oxford English Dictionary, one of the most authoritative, recognized that "interpreter" can mean one who translates writings, but it expressly designated that meaning as obsolete. Any definition of a word that is absent from many dictionaries and is deemed obsolete in others is hardly a common or ordinary meaning. Given this survey of relevant dictionaries, the ordinary meaning of "interpreter" does not include those who translate writings. Nothing in the Court Interpreters Act or in §1920 hints that Congress intended to go beyond this ordinary meaning. If anything, the statutory context suggests that "interpreter" includes only those who translate orally. See 28 U. S. C. §1827. Moreover, Congress' use of technical terminology reflects the distinction in relevant professional literature between interpreters, who are used for oral conversations, and translators, who are used for written communications. Pp. 5–11.

(c) No other tool of construction compels a departure from the ordinary meaning of "interpreter." This Court has never held that Rule 54(d) creates a presumption in favor of the broadest possible reading of the costs enumerated in §1920. To the contrary, the Court has made clear that the "discretion granted by Rule 54(d) is not a power to evade" the specific categories of costs set forth by Congress, *Crawford Fitting, supra,* at 442, but "is solely a power to decline to tax, as costs, the items enumerated in §1920," *ibid.* This Court's conclusion is in keeping with the narrow bounds of taxable costs, which are limited by statute and modest in scope. Respondent's extratextual arguments—that documentary evidence is no less important than testimonial evidence and that some translation tasks are not entirely oral or entirely written—are more properly directed at Congress. In any event, neither argument is so compelling that Congress must have intended to dispense with the ordinary meaning of "interpreter"

Syllabus

in §1920(6).  Pp. 12–15.

633 F. 3d 1218, vacated and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, and KAGAN, JJ., joined.  GINSBURG, J., filed a dissenting opinion, in which BREYER and SOTOMAYOR, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 10–1472

KOUICHI TANIGUCHI, PETITIONER *v.* KAN PACIFIC SAIPAN, LTD., DBA MARIANAS RESORT AND SPA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 21, 2012]

JUSTICE ALITO delivered the opinion of the Court.

The costs that may be awarded to prevailing parties in lawsuits brought in federal court are set forth in 28 U. S. C. §1920.  The Court Interpreters Act amended that statute to include "compensation of interpreters." §1920(6); see also §7, 92 Stat. 2044.  The question presented in this case is whether "compensation of interpreters" covers the cost of translating documents.  Because the ordinary meaning of the word "interpreter" is a person who translates orally from one language to another, we hold that "compensation of interpreters" is limited to the cost of oral translation and does not include the cost of document translation.

I

This case arises from a personal injury action brought by petitioner Kouichi Taniguchi, a professional baseball player in Japan, against respondent Kan Pacific Saipan, Ltd., the owner of a resort in the Northern Mariana Islands.  Petitioner was injured when his leg broke through a wooden deck during a tour of respondent's resort property.  Initially, petitioner said that he needed no medical

attention, but two weeks later, he informed respondent that he had suffered cuts, bruises, and torn ligaments from the accident. Due to these alleged injuries, he claimed damages for medical expenses and for lost income from contracts he was unable to honor. After discovery concluded, both parties moved for summary judgment. The United States District Court for the Northern Mariana Islands granted respondent's motion on the ground that petitioner offered no evidence that respondent knew of the defective deck or otherwise failed to exercise reasonable care.

In preparing its defense, respondent paid to have various documents translated from Japanese to English. After the District Court granted summary judgment in respondent's favor, respondent submitted a bill for those costs. Over petitioner's objection, the District Court awarded the costs to respondent as "compensation of interpreters" under §1920(6). Explaining that interpreter services "cannot be separated into 'translation' and 'interpretation,'" App. to Pet. for Cert. 25a, the court held that costs for document translation "fal[l] within the meaning of 'compensation of an interpreter,'" *ibid.* Finding that it was necessary for respondent to have the documents translated in order to depose petitioner, the court concluded that the translation services were properly taxed as costs.

The United States Court of Appeals for the Ninth Circuit affirmed both the District Court's grant of summary judgment and its award of costs. The court rejected petitioner's argument that the cost of document translation services is not recoverable as "compensation of interpreters." The court explained that "the word 'interpreter' can reasonably encompass a 'translator,' both according to the dictionary definition and common usage of these terms, which does not always draw precise distinctions between foreign language interpretations involving live speech

versus written documents." 633 F. 3d 1218, 1221 (2011). "More importantly," the court stressed, this construction of the statute "is more compatible with Rule 54 of the Federal Rules of Civil Procedure, which includes a decided preference for the award of costs to the prevailing party." *Ibid.* The court thus concluded that "the prevailing party should be awarded costs for services required to interpret either live speech or written documents into a familiar language, so long as interpretation of the items is necessary to the litigation." *Id.,* at 1221–1222.

Because there is a split among the Courts of Appeals on this issue,[1] we granted certiorari. 564 U. S. \_\_\_ (2011).

## II

### A

Although the taxation of costs was not allowed at common law, it was the practice of federal courts in the early years to award costs in the same manner as the courts of the relevant forum State. *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240, 247–248 (1975). In 1793, Congress enacted a statute that authorized the awarding of certain costs to prevailing parties based on state law:

> "That there be allowed and taxed in the supreme, circuit and district courts of the United States, in favour of the parties obtaining judgments therein, such compensation for their travel and attendance, and for at-

---

[1] Compare *BDT Products, Inc.* v. *Lexmark Int'l, Inc.*, 405 F. 3d 415, 419 (CA6 2005) (holding that document translation costs are taxable under §1920(6) because the "definition of interpret expressly includes to 'translate into intelligible or familiar language'" (quoting Webster's Third New International Dictionary 1182 (1981))), with *Extra Equipamentos E Exportação Ltda.* v. *Case Corp.*, 541 F. 3d 719, 727–728 (CA7 2008) (holding that document translation costs are not taxable under §1920(6) because an interpreter is "normally understood [as] a person who translates living speech from one language to another").

> tornies and counsellors' fees . . . as are allowed in the supreme or superior courts of the respective states." Act of Mar. 1, 1793, §4, 1 Stat. 333.

Although twice reenacted, this provision expired in 1799. *Alyeska Pipeline*, *supra*, at 248, n. 19; *Crawford Fitting Co.* v. *J. T. Gibbons, Inc.*, 482 U. S. 437, 439 (1987). Yet even in the absence of express legislative authorization, the practice of referring to state rules for the taxation of costs persisted. See *Alyeska Pipeline*, 421 U. S., at 250.

Not until 1853 did Congress enact legislation specifying the costs allowable in federal court. *Id.,* at 251. The impetus for a uniform federal rule was largely the consequence of two developments. First, a "great diversity in practice among the courts" had emerged. *Ibid.* Second, "losing litigants were being unfairly saddled with exorbitant fees for the victor's attorney." *Ibid.* Against this backdrop, Congress passed the 1853 Fee Act, which we have described as a "far-reaching Act specifying in detail the nature and amount of the taxable items of cost in the federal courts." *Id.,* at 251–252. The substance of this Act was transmitted through the Revised Statutes of 1874 and the Judicial Code of 1911 to the Revised Code of 1948, where it was codified, "without any apparent intent to change the controlling rules," as 28 U. S. C. §1920. 421 U. S., at 255.

Federal Rule of Civil Procedure 54(d) gives courts the discretion to award costs to prevailing parties. That Rule provides in relevant part: "Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Rule 54(d)(1). We have held that "§1920 defines the term 'costs' as used in Rule 54(d)." *Crawford Fitting*, 482 U. S., at 441. In so doing, we rejected the view that "the discretion granted by Rule 54(d) is a separate source of power to tax as costs expenses not enumerated in

§1920." *Ibid.*

As originally configured, §1920 contained five categories of taxable costs: (1) "[f]ees of the clerk and marshal"; (2) "[f]ees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case"; (3) "[f]ees and disbursements for printing and witnesses"; (4) "[f]ees for exemplification and copies of papers necessarily obtained for use in the case"; and (5) "[d]ocket fees under section 1923 of this title." 62 Stat. 955. In 1978, Congress enacted the Court Interpreters Act, which amended §1920 to add a sixth category: "Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title." 28 U. S. C. §1920(6); see also §7, 92 Stat. 2044. We are concerned here with this sixth category, specifically the item of taxable costs identified as "compensation of interpreters."

### B

To determine whether the item "compensation of interpreters" includes costs for document translation, we must look to the meaning of "interpreter." That term is not defined in the Court Interpreters Act or in any other relevant statutory provision. When a term goes undefined in a statute, we give the term its ordinary meaning. *Asgrow Seed Co.* v. *Winterboer*, 513 U. S. 179, 187 (1995). The question here is: What is the ordinary meaning of "interpreter"?

Many dictionaries in use when Congress enacted the Court Interpreters Act in 1978 defined "interpreter" as one who translates spoken, as opposed to written, language. The American Heritage Dictionary, for instance, defined the term as "[o]ne who translates orally from one language into another." American Heritage Dictionary 685 (1978). The Scribner-Bantam English Dictionary defined the related word "interpret" as "to translate orally." Scribner-

Bantam English Dictionary 476 (1977). Similarly, the Random House Dictionary defined the intransitive form of "interpret" as "to translate what is *said* in a foreign language." Random House Dictionary of the English Language 744 (1973) (emphasis added). And, notably, the Oxford English Dictionary defined "interpreter" as "[o]ne who translates languages," but then divided that definition into two senses: "a. [a] translator of books or writings," which it designated as obsolete, and "b. [o]ne who translates the communications of persons speaking different languages; *spec.* one whose office it is to do so orally in the presence of the persons; a dragoman." 5 Oxford English Dictionary 416 (1933); see also Concise Oxford Dictionary of Current English 566 (6th ed. 1976) ("One who interprets; one whose office it is to translate the words of persons speaking different languages, esp. orally in their presence"); Chambers Twentieth Century Dictionary 686 (1973) ("one who translates orally for the benefit of two or more parties speaking different languages: . . . a translator (*obs.*)").

Pre-1978 legal dictionaries also generally defined the words "interpreter" and "interpret" in terms of oral translation. The then-current edition of Black's Law Dictionary, for example, defined "interpreter" as "[a] person sworn at a trial to interpret the evidence of a foreigner . . . to the court," and it defined "interpret" in relevant part as "to translate orally from one tongue to another." Black's Law Dictionary 954, 953 (rev. 4th ed. 1968); see also W. Anderson, A Dictionary of Law 565 (1888) ("One who translates the testimony of witnesses speaking a foreign tongue, for the benefit of the court and jury"); 1 B. Abbott, Dictionary of Terms and Phrases Used in American or English Jurisprudence 639 (1878) ("one who restates the testimony of a witness testifying in a foreign tongue, to the court and jury, in their language"). But see Ballentine's Law Dictionary 655, 654 (3d ed. 1969) (defining "inter-

preter" as "[o]ne who interprets, particularly one who interprets words written or spoken in a foreign language," and "interpret" as "to translate from a foreign language").

Against these authorities, respondent relies almost exclusively on Webster's Third New International Dictionary (hereinafter Webster's Third). The version of that dictionary in print when Congress enacted the Court Interpreters Act defined "interpreter" as "one that translates; *esp*: a person who translates orally for parties conversing in different tongues." Webster's Third 1182 (1976).[2] The sense divider *esp* (for especially) indicates that the most common meaning of the term is one "who translates orally," but that meaning is subsumed within the more general definition "one that translates." See 12,000 Words: A Supplement to Webster's Third 15a (1986) (explaining that *esp* "is used to introduce the most common meaning included in the more general preceding definition"). For respondent, the general definition suffices to establish that the term "interpreter" ordinarily includes persons who translate the written word. Explaining that "the word 'interpreter' can reasonably encompass a 'translator,'" the Court of Appeals reached the same conclusion. 633 F. 3d, at 1221. We disagree.

That a definition is broad enough to encompass one sense of a word does not establish that the word is *ordinarily* understood in that sense. See *Mallard* v. *United States Dist. Court for Southern Dist. of Iowa*, 490 U. S.

---

[2] A handful of other contemporaneous dictionaries used a similar formulation. See Funk & Wagnalls New Comprehensive International Dictionary of the English Language 665 (1977) ("One who interprets or translates; specifically, one who serves as oral translator between people speaking different languages"); 1 World Book Dictionary 1103 (C. Barnhart & R. Barnhart eds. 1977) ("a person whose business is translating, especially orally, from a foreign language"); Cassell's English Dictionary 617 (4th ed. 1969) ("One who interprets, esp. one employed to translate orally to persons speaking a foreign language").

296, 301 (1989) (relying on the "most common meaning" and the "ordinary and natural signification" of the word "request," even though it may sometimes "double for 'demand' or 'command'"). The fact that the definition of "interpreter" in Webster's Third has a sense divider denoting the most common usage suggests that other usages, although acceptable, might not be common or ordinary. It is telling that all the dictionaries cited above defined "interpreter" at the time of the statute's enactment as including persons who translate orally, but only a handful defined the word broadly enough to encompass translators of written material. See *supra,* at 5–7. Although the Oxford English Dictionary, one of the most authoritative on the English language, recognized that "interpreter" *can* mean one who translates writings, it expressly designated that meaning as obsolete. See *supra,* at 6. Were the meaning of "interpreter" that respondent advocates truly common or ordinary, we would expect to see more support for that meaning. We certainly would not expect to see it designated as obsolete in the Oxford English Dictionary. Any definition of a word that is absent from many dictionaries and is deemed obsolete in others is hardly a common or ordinary meaning.

Based on our survey of the relevant dictionaries, we conclude that the ordinary or common meaning of "interpreter" does not include those who translate writings. Instead, we find that an interpreter is normally understood as one who translates orally from one language to another. This sense of the word is far more natural. As the Seventh Circuit put it: "Robert Fagles made famous translations into English of the *Iliad*, the *Odyssey*, and the *Aeneid*, but no one would refer to him as an English-language 'interpreter' of these works." *Extra Equipamentos E Exportação Ltda.* v. *Case Corp.*, 541 F. 3d 719, 727 (2008).

To be sure, the word "interpreter" can encompass per-

sons who translate documents, but because that is not the ordinary meaning of the word, it does not control unless the context in which the word appears indicates that it does. Nothing in the Court Interpreters Act or in §1920, however, even hints that Congress intended to go beyond the ordinary meaning of "interpreter" and to embrace the broadest possible meaning that the definition of the word can bear.

If anything, the statutory context suggests the opposite: that the word "interpreter" applies only to those who translate orally. As previously mentioned, Congress enacted §1920(6) as part of the Court Interpreters Act. The main provision of that Act is §2(a), codified in 28 U. S. C. §§1827 and 1828. See 92 Stat. 2040–2042. Particularly relevant here is §1827. As it now reads, that statute provides for the establishment of "a program to facilitate the use of certified and otherwise qualified interpreters in judicial proceedings instituted by the United States." §1827(a). Subsection (d) directs courts to use an interpreter in any criminal or civil action instituted by the United States if a party or witness "speaks only or primarily a language other than the English language" or "suffers from a hearing impairment" "so as to inhibit such party's comprehension of the proceedings or communication with counsel or the presiding judicial officer, or so as to inhibit such witness' comprehension of questions and the presentation of such testimony." §1827(d)(1).[3] As originally enacted, subsection (k) mandated that the "interpretation provided by certified interpreters . . . shall be in the consecutive mode except that the presiding judicial officer . . . may authorize a simultaneous or summary interpretation." §1827(k) (1976 ed., Supp. II); see also 92 Stat. 2042.

---

[3] This provision remains substantially the same as it appeared when first enacted. See 28 U. S. C. §1827(d)(1) (1976 ed., Supp. II); see also 92 Stat. 2040.

In its current form, subsection (k) provides that interpretation "shall be in the simultaneous mode for any party . . . and in the consecutive mode for witnesses," unless the court directs otherwise. The simultaneous, consecutive, and summary modes are all methods of oral interpretation and have nothing to do with the translation of writings.[4] Taken together, these provisions are a strong contextual clue that Congress was dealing only with oral translation in the Court Interpreters Act and that it intended to use the term "interpreter" throughout the Act in its ordinary sense as someone who translates the spoken word. As we have said before, it is a "'normal rule of statutory construction' that 'identical words used in different parts of the same act are intended to have the same meaning.'" *Gustafson* v. *Alloyd Co.,* 513 U. S. 561, 570 (1995) (quoting *Department of Revenue of Ore.* v. *ACF Industries, Inc.*, 510 U. S. 332, 342 (1994)).[5]

The references to technical terminology in the Court Interpreters Act further suggest that Congress used "in-

_____

[4] The simultaneous mode requires the interpreter "to interpret and to speak contemporaneously with the individual whose communication is being translated." H. R. Rep. No. 95–1687, p. 8 (1978). The consecutive mode requires the speaker whose communication is being translated to pause so that the interpreter can "convey the testimony given." *Ibid.* And the summary mode "allow[s] the interpreter to condense and distill the speech of the speaker." *Ibid.;* see generally Zazueta, Attorneys Guide to the Use of Court Interpreters, 8 U. C. D. L. Rev. 471, 477–478 (1975).

[5] The dissent agrees that context should help guide our analysis, but instead of looking to the Court Interpreters Act, it looks to "the practice of federal courts both before and after §1920(6)'s enactment." *Post,* at 4 (opinion of GINSBURG, J.). The practice of federal courts *after* the Act's enactment tells us nothing about what Congress intended at the time of enactment. And federal court practice *before* the Act under other provisions of §1920 tells us little, if anything, about what Congress intended when it added subsection (6). We think the statutory context in which the word "interpreter" appears is a more reliable guide to its meaning.

terpreter" in a technical sense, and it is therefore significant that relevant professional literature draws a line between "interpreters," who "are used for oral conversations," and "translators," who "are used for written communications." Zazueta, *supra* n. 4, at 477; see also M. Frankenthaler, Skills for Bilingual Legal Personnel 67 (1982) ("While the translator deals with the written word, the interpreter is concerned with the spoken language"); Brislin, Introduction, in Translation: Applications and Research 1 (R. Brislin ed. 1976) (explaining that when both terms are used together, translation "refers to the processing [of] written input, and interpretation to the processing of oral input" (emphasis deleted)); J. Herbert, Interpreter's Handbook 1 (2d ed. 1952) ("In the present-day jargon of international organisations, the words translate, translations, translator are used when the immediate result of the work is a written text; and the words interpret, interpreter, interpretation when it is a speech delivered orally"). That Congress specified "interpreters" but not "translators" is yet another signal that it intended to limit §1920(6) to the costs of oral, instead of written, translation.[6]

In sum, both the ordinary and technical meanings of "interpreter," as well as the statutory context in which the word is found, lead to the conclusion that §1920(6) does not apply to translators of written materials.[7]

──────────

[6] Some provisions within the United States Code use both "interpreter" and "translator" together, thus implying that Congress understands the terms to have the distinct meanings described above. See, *e.g.,* 8 U. S. C. §1555(b) (providing that appropriations for the Immigration and Naturalization Service "shall be available for payment of . . . interpreters and translators who are not citizens of the United States"); 28 U. S. C. §530C(b)(1)(I) (providing that Department of Justice funds may be used for "[p]ayment of interpreters and translators who are not citizens of the United States").

[7] Our conclusion is buttressed by respondent's concession at oral argument that there is no provision in the United States Code where it is

## C

No other rule of construction compels us to depart from the ordinary meaning of "interpreter." The Court of Appeals reasoned that a broader meaning is "more compatible with Rule 54 of the Federal Rules of Civil Procedure, which includes a decided preference for the award of costs to the prevailing party." 633 F. 3d, at 1221. But we have never held that Rule 54(d) creates a presumption of statutory construction in favor of the broadest possible reading of the costs enumerated in §1920. To the contrary, we have made clear that the "discretion granted by Rule 54(d) is not a power to evade" the specific categories of costs set forth by Congress. *Crawford Fitting*, 482 U. S., at 442. "Rather," we have said, "it is solely a power to decline to tax, as costs, the items enumerated in §1920." *Ibid.* Rule 54(d) thus provides no sound basis for casting aside the ordinary meaning of the various items enumerated in the costs statute, including the ordinary meaning of "interpreter."

Our decision is in keeping with the narrow scope of taxable costs. "Although 'costs' has an everyday meaning synonymous with 'expenses,' the concept of taxable costs under Rule 54(d) is more limited and represents those expenses, including, for example, court fees, that a court will assess against a litigant." 10 C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2666, pp. 202–203 (3d ed. 1998) (hereinafter Wright & Miller). Taxable costs are limited to relatively minor, incidental expenses as is evident from §1920, which lists such items as clerk

---

clear that the word extends to those who translate documents. Tr. of Oral Arg. 39; see also Brief for Petitioner 32 ("And the Code is wholly devoid of any corresponding definition of 'interpreter' extending to the translation of written documents"). As respondent acknowledged, either the word is used in a context that strongly suggests it applies only to oral translation or its meaning is unclear. See Tr. of Oral Arg. 38.

fees, court reporter fees, expenses for printing and witnesses, expenses for exemplification and copies, docket fees, and compensation of court-appointed experts. Indeed, "the assessment of costs most often is merely a clerical matter that can be done by the court clerk." *Hairline Creations, Inc.* v. *Kefalas*, 664 F. 2d 652, 656 (CA7 1981). Taxable costs are a fraction of the nontaxable expenses borne by litigants for attorneys, experts, consultants, and investigators. It comes as little surprise, therefore, that "costs almost always amount to less than the successful litigant's total expenses in connection with a lawsuit." 10 Wright & Miller §2666, at 203. Because taxable costs are limited by statute and are modest in scope, we see no compelling reason to stretch the ordinary meaning of the cost items Congress authorized in §1920.

As for respondent's extratextual arguments, they are more properly directed at Congress. Respondent contends that documentary evidence is no less important than testimonial evidence and that it would be anomalous to require the losing party to cover translation costs for spoken words but not for written words. Brief for Respondent 20. Respondent also observes that some translation tasks are not entirely oral or entirely written. *Id.,* at 20–24. One task, called "'sight translation,'" involves the oral translation of a document. *Id.,* at 21. Another task involves the written translation of speech. *Ibid.* And a third task, called "'document comparison,'" involves comparing documents in the source and target language to verify that the two are identical. *Id.,* at 21–22. Respondent argues that a narrow definition cannot account for these variations and that a bright-line definition of "interpreter" as someone who translates spoken and written words would avoid complication and provide a simple, administrable rule for district courts.

Neither of these arguments convinces us that Congress must have intended to dispense with the ordinary mean-

ing of "interpreter" in §1920(6). First, Congress might have distinguished between oral and written translation out of a concern that requiring losing parties to bear the potentially sizable costs of translating discovery documents, as opposed to the more limited costs of oral testimony, could be too burdensome and possibly unfair, especially for litigants with limited means. Cf. *Fleischmann Distilling Corp.* v. *Maier Brewing Co.*, 386 U. S. 714, 718 (1967) (noting the argument "that since litigation is at best uncertain one should not be penalized for merely defending or prosecuting a lawsuit, and that the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel"). Congress might also have concluded that a document translator is more akin to an expert or consultant retained by a party to decipher documentary evidence—like, for instance, a forensic accountant—than to an interpreter whose real-time oral translation services are necessary for communication between litigants, witnesses, and the court.[8]

Second, respondent has not shown that any of the hybrid translation/interpretation tasks to which it points actually arise with overwhelming frequency or that the problem of drawing the line between taxable and nontaxable costs in such cases will vex the trial courts. It certainly has not shown that any such problems will be more troublesome than the task of sifting through translated

———————

[8]The dissent contends that document translation, no less than oral translation, is essential "to equip the parties to present their case clearly and the court to decide the merits intelligently." *Post,* at 5. But a document translator is no more important than an expert or consultant in making sense of otherwise incomprehensible documentary evidence, yet expenses for experts and consultants are generally not taxable as costs. To be sure, forgoing document translation can impair a litigant's case, but document translation is not indispensable, in the way oral translation is, to the parties' ability to communicate with each other, with witnesses, and with the court.

discovery documents to ascertain which can be taxed as necessary to the litigation. In any event, the present case does not present a hybrid situation; it involves purely written translation, which falls outside the tasks performed by an "interpreter" as that term is ordinarily understood.

\* \* \*

Because the ordinary meaning of "interpreter" is someone who translates orally from one language to another, we hold that the category "compensation of interpreters" in §1920(6) does not include costs for document translation. We therefore vacate the judgment of the United States Court of Appeals for the Ninth Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 10–1472

_____

KOUICHI TANIGUCHI, PETITIONER *v.* KAN PACIFIC
SAIPAN, LTD., DBA MARIANAS RESORT AND SPA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[May 21, 2012]

JUSTICE GINSBURG, with whom JUSTICE BREYER and
JUSTICE SOTOMAYOR join, dissenting.

To be comprehended by the parties, the witnesses, and
the court, expression in foreign languages must be trans-
lated into English. Congress therefore provided, in 28
U. S. C. §1920(6), that the prevailing party may recoup
compensation paid to "interpreters." The word "interpret-
ers," the Court emphasizes, commonly refers to translators
of oral speech. *Ante*, at 5–6. But as the Court acknowl-
edges, *ante*, at 7, and n. 2, "interpreters" is more than
occasionally used to encompass those who translate writ-
ten speech as well. See Webster's Third New International
Dictionary of the English Language 1182 (1976) (here-
inafter Webster's) (defining "interpreter" as "one that
translates; *esp*: a person who translates orally for parties
conversing in different tongues"); Black's Law Dictionary
895 (9th ed. 2009) (defining "interpreter" as a "person who
translates, esp. orally, from one language to another");
Ballentine's Law Dictionary 655 (3d ed. 1969) (defining
"interpreter" as "[o]ne who interprets, particularly one
who interprets words written or spoken in a foreign
language").

In short, employing the word "interpreters" to include
translators of written as well as oral speech, if not "the
most common usage," *ante,* at 8, is at least an "acceptable"

usage, *ibid.* Moreover, the word "interpret" is generally understood to mean "to explain or tell the meaning of: translate into intelligible or familiar language or terms," while "translate" commonly means "to turn into one's own or another language." Webster's 1182, 2429. See also Random House Dictionary of the English Language 744, 1505 (1973) (defining the transitive verb "interpret" as, *inter alia*, "to translate," and "translate" as "to turn (something written or spoken) from one language into another").

Notably, several federal district court decisions refer to translators of written documents as "interpreters." *E.g., United States* v. *Prado-Cervantez*, No. 11–40044–11, 2011 WL 4691934, *3 (Kan., Oct. 6, 2011) ("Standby counsel should also be prepared to arrange for interpreters to interpret or translate documents when necessary for defendant."); *Mendoza* v. *Ring*, No. 07–3114, 2008 WL 2959848, *2 (CD Ill., July 30, 2008) ("The interpreter is also directed to translate filings by the plaintiff from Spanish to English. The original and translated versions will be docketed."). So do a number of state statutes. *E.g.,* Cal. Govt. Code Ann. §26806(a) (West 2008) ("[T]he clerk of the court may employ as many foreign language interpreters as may be necessary . . . to translate documents intended for filing in any civil or criminal action . . . .").

Most federal courts of appeals confronted with the question have held that costs may be awarded under §1920(6) for the translation of documents necessary to, or in preparation for, litigation. Compare 633 F. 3d 1218, 1220–1222 (CA9 2011); *BDT Prods., Inc.* v. *Lexmark Int'l, Inc.*, 405 F. 3d 415, 419 (CA6 2005); *Slagenweit* v. *Slagenweit*, 63 F. 3d 719, 721 (CA8 1995) *(per curiam);* and *Chore-Time Equip., Inc.* v. *Cumberland Corp.*, 713 F. 2d 774, 782 (CA Fed. 1983) (all holding that costs for document translation are covered by §1920(6)), with *Extra Equipamentos E Exportação Ltda.* v. *Case Corp.*, 541 F. 3d 719, 727–728 (CA7 2008) (costs for document translation are not covered

by §1920(6)).  See also *In re Puerto Rico Elec. Power Auth.*, 687 F. 2d 501, 506, 510 (CA1 1982) (recognizing that costs of document translation may be reimbursed, without specifying the relevant subsection of §1920); *Studiengesellschaft Kohle mbH* v. *Eastman Kodak Co.*, 713 F. 2d 128, 133 (CA5 1983) (allowing document translation costs under §1920(4)); *Quy* v. *Air Am., Inc.*, 667 F. 2d 1059, 1065 (CADC 1981) (allowing "translation costs" under §1920(6)).[1]

In practice, federal trial courts have awarded document translation costs in cases spanning several decades.  See, *e.g., Raffold Process Corp.* v. *Castanea Paper Co.*, 25 F. Supp. 593, 594 (WD Pa. 1938).  Before the Court Interpreters Act added §1920(6) to the taxation of costs statute in 1978, district courts awarded costs for document translation under §1920(4), which allowed taxation of "[f]ees for exemplification and copies of papers," 28 U. S. C. §1920(4) (1976 ed.), or under §1920's predecessor, 28 U. S. C. §830 (1925 ed.).  See, *e.g., Bennett Chemical Co.* v. *Atlantic Commodities, Ltd.*, 24 F. R. D. 200, 204 (SDNY 1959) (§1920(4)); *Raffold Process Corp.*, 25 F. Supp., at 594 (§830).  Pre-1978, district courts also awarded costs for oral translation of witness testimony.  See, *e.g., Kaiser Industries Corp.* v. *McLouth Steel Corp.*, 50 F. R. D. 5, 11 (ED Mich. 1970).  Nothing in the Court Interpreters Act, a measure intended to expand access to interpretation services, indicates a design to eliminate the availability of costs awards for document translation.  See S. Rep. No. 95–569, p. 4 (1977) (hereinafter S. Rep.) ("The committee . . . feels the time has come to provide by statute for the provision of and access to qualified certified interpret-

_____

[1] Translation costs, like other costs recoverable under §1920, may be "denied or limited" if they "were unreasonably incurred or unnecessary to the case."  10 Moore's Federal Practice §54.101[1][b], p. 54–158 (3d ed. 2012).

ers, for a broader spectrum of people than the present law allows."). Post-1978, rulings awarding document translation costs under §1920(6) indicate the courts' understanding both that the term "interpreter" can readily encompass oral and written translation, and that Congress did not otherwise instruct.[2] I agree that context should guide the determination whether §1920(b) is most sensibly read to encompass persons who translate documents. See *ante*, at 8–9. But the context key for me is the practice of federal courts both before and after §1920(6)'s enactment.

The purpose of translation, after all, is to make relevant foreign-language communication accessible to the litigants and the court. See S. Rep., at 1 (The Court Interpreters Act is intended "to insure that all participants in our

———————————

[2] Currently, some federal district courts make the practice of allowing fees for translation of documents explicit in their local rules. See Rule 54–4.8 (CD Cal. 2012) (allowing "[f]ees for translation of documents . . . reasonably necessary to the preparation of the case"); Rule 54.1 (Guam 2011) (same); Rule 54.1(c)(7) (Idaho 2011) (allowing reasonable fee if the "document translated is necessarily filed or admitted in evidence"); Rule 54.7 (MD Pa. 2011) (same); Rule 54.1 (Ariz. 2012) (same); Rule 54.1(b)(4)(e) (SD Cal. 2012) (same); Rule 54.1 (NJ 2011) (same); Rule 54–5(d) (Nev. 2011) (same); Rule 54.2 (NM 2012) (allowing translator's fee if the translated document is admitted into evidence); Rule 54.1(c)(4) (SDNY 2012) (allowing reasonable fee if translated document "is used or received in evidence"); Rule 54.1(c)(4) (EDNY 2012) (same). See also Rule 54.03(F)(1)(c) (SC 2012) (allowing costs of certain document translations under §1920(4)); Rule 54.1(b)(5) (Del. 2011) (same); Rule 54(c)(3)(i) (Conn. 2011) (same); Misc. Order ¶7, Allowable Items for Taxation of Costs (ND Fla. 2007) (allowing "fee of a competent translator of a non-English document that is filed or admitted into evidence"); Taxation of Costs Guidelines (PR 2009) (allowing fees for translation of documents filed or admitted into evidence), available at http://www.prd.uscourts.gov/courtweb/pdf/taxation_of_costs_guidelines_ 2007_with_time_computation_amendments.pdf (All Internet materials as visited May 17, 2012, and included in Clerk of Court's case file); Taxation of Costs (Mass. 2000) (allowing fees "for translation of documents . . . reasonably necessary for trial preparation"), available at http://www.mad.uscourts.gov/resources/pdf/taxation.pdf.

Federal courts can meaningfully take part."). Documentary evidence in a foreign language, no less than oral statements, must be translated to equip the parties to present their case clearly and the court to decide the merits intelligently. See, *e.g.*, *United States* v. *Mosquera*, 816 F. Supp. 168, 175 (EDNY 1993) ("For a non-English speaking [party] to stand equal with others before the court requires translation [of relevant documents]."); *Lockett* v. *Hellenic Sea Transports, Ltd.*, 60 F. R. D. 469, 473 (ED Pa. 1973) ("To be understood by counsel for plaintiffs and defendant, as well as for use at trial, the [ship's] deck log had to be translated [from Greek] into the English language.").[3] And it is not extraordinary that what documents say, more than what witnesses testify, may make or break a case.

Distinguishing written from oral translation for cost-award purposes, moreover, is an endeavor all the more dubious, for, as the Court acknowledges, *ante*, at 13, some translation tasks do not fall neatly into one category or the other. An interpreter, for example, may be called upon to "sight translate" a written document, *i.e.*, to convey a written foreign-language document's content orally in English. R. González, V. Vásquez, & H. Mikkelson, Fundamentals of Court Interpretation: Theory, Policy and Practice 401 (1991) (hereinafter González). In-court sight translation, Taniguchi concedes, counts as "interpretation," even though it does not involve translating verbal expression. Tr. of Oral Arg. 10. Yet an interpreter's preparation for in-court sight translation by translating a

_____

[3] Noteworthy, other paragraphs Congress placed in §1920 cover written documents. See 28 U. S. C. §1920(2) (2006 ed., Supp. IV) ("Fees for printed or electronically recorded transcripts"); §1920(3) (2006 ed.) ("Fees and disbursements for printing and witnesses"); §1920(4) ("Fees for exemplification and the costs of making copies of any [necessary] materials"). Nothing indicates that Congress intended paragraph (6), unlike paragraphs (2)–(4), to apply exclusively to oral communications.

written document in advance, Taniguchi maintains, does not count as "interpretation." *Ibid.* But if the interpreter then reads the prepared written translation aloud in court, that task, in Taniguchi's view, can be charged as "interpretation," *id.*, at 11, even though the reading involves no translation of foreign-language expression— written *or* oral—at all.

Similarly hard to categorize is the common court-interpreter task of listening to a recording in a foreign language, transcribing it, then translating it into English. See González 439. Although this task involves oral foreign-language communication, it does not, Taniguchi contends, qualify as "interpretation," because it involves "the luxury of multiple playbacks of the tape and the leisure to consult extrinsic linguistic sources." Reply Brief for Petitioner 9 (internal quotation marks omitted). But sight translation—which Taniguchi concedes may be charged as "interpretation"—may sometimes involve similarly careful linguistic analysis of a written document in advance of a court proceeding. Davis & Hewitt, Lessons in Administering Justice: What Judges Need to Know about the Requirements, Role, and Professional Responsibilities of the Court Interpreter, 1 Harv. Latino L. Rev. 121, 131 (1994).

Taniguchi warns that translation costs can be exorbitant and burdensome to police. Reply Brief 19–22; Tr. of Oral Arg. 20–21. The Court expresses a similar concern. *Ante*, at 13–14.[4] Current practice in awarding translation

―――――――

[4] The Court also observes that "[t]axable costs are limited to relatively minor, incidental expenses." *Ante*, at 12. The tab for unquestionably allowable costs, however, may run high. See, *e.g., In re Ricoh Co., Ltd. Patent Litigation*, No. C 03–02289, 2012 WL 1499191, *6 (ND Cal., Apr. 26, 2012) (awarding $440,000 in copying costs); *Jones* v. *Halliburton Co.*, No. 4:07–cv–2719, 2011 WL 4479119, *2 (SD Tex., Sept. 26, 2011) (awarding $57,300 in fees for court-appointed expert). Translation costs, on the other hand, are not inevitably large. See Brief for Re-

costs, however, has shown that district judges are up to the task of confining awards to translation services necessary to present or defeat a claim. See *Eastman Kodak Co.*, 713 F. 2d, at 133 (district court should not award document translation costs "carte blanche," but must determine whether such costs were necessarily incurred). See also, *e.g.*, *Conn* v. *Zakharov*, No. 1:09 CV 0760, 2010 WL 2293133, *3 (ND Ohio, June 4, 2010) (denying translation costs where prevailing party did not demonstrate the costs were necessary); *Maker's Mark Distillery, Inc.* v. *Diageo North Am., Inc.*, No. 3:03–CV–93, 2010 WL 2651186, *3 (WD Ky., June 30, 2010) (same); *Competitive Technologies* v. *Fujitsu Ltd.*, No. C–02–1673, 2006 WL 6338914, *11 (ND Cal., Aug. 23, 2006) (same); *Arboireau* v. *Adidas Salomon AG*, No. CV–01–105, 2002 WL 31466564, *6 (Ore., June 14, 2002) (same); *Oetiker* v. *Jurid Werke, GmbH*, 104 F. R. D. 389, 393 (DC 1982) (same); *Lockett*, 60 F. R. D., at 473 (awarding costs for "necessary" translations); *Kaiser*, 50 F. R. D., at 11–12 (same); *Bennett*, 24 F. R. D., at 204 (same); *Raffold Process Corp.*, 25 F. Supp., at 594 (same). Courts of appeals, in turn, are capable of reviewing such judgments for abuse of discretion.

In short, §1920(6)'s prescription on "interpreters" is not so clear as to leave no room for interpretation. Given the purpose served by translation and the practice prevailing in district courts, *supra*, at 3, there is no good reason to exclude from taxable costs payments for placing written words within the grasp of parties, jurors, and judges. I would therefore affirm the judgment of the Ninth Circuit.

---

spondent 26–27, n. 12 (listing, *inter alia*, 21 translation cost awards of less than $13,000, of which at least fourteen were less than $3,000).